## LEO N. LAMMI v. FRANCES LAMMI.[1]

May 20, 1955.

No. 36,523.

---

[1]Reported in 70 N. W. (2d) 456.

*M. J. McKeon,* for appellant.

*Eckman & Eckman,* for respondent.

THOMAS GALLAGHER, JUSTICE.

This is an appeal from an order dated August 31, 1954, amending a judgment and decree in divorce proceedings in St. Louis county. The original judgment dated December 14, 1948, awarded defendant Frances Lammi, now Frances Falde, custody of the two minor boys of the parties then age five and two and one-half years. The order

appealed from awards plaintiff custody of the boys and absolves him from making further payment to defendant for their support. There is also an appeal from an order dated June 11, 1954, denying defendant's motion that plaintiff be adjudged in contempt for failure to make support payments in the sum of $50 per month in accordance with the judgment and that such support payments be increased from $50 to $75 per month. The order did require plaintiff to pay defendant $25 per month until arrearages in support payments totaling over $1,800 had been paid.

The order of August 31, 1954, did not find defendant unfit to have custody, but the trial court justified the change therein ordered because from September of 1949 until June 1, 1954, the children have lived a major part of the time with defendant's mother, Mrs. Pearl Pulkrabek, near Hinckley while defendant has worked as a waitress in St. Paul to earn funds to care for their maintenance. This the trial court found contrary to the judgment which provided:

"* * * that defendant is a fit and proper person to have the custody of said children and can keep them with her at the premises where she lives in St. Paul and where they will have adequate supervision and care while she is at work; * * *."

On appeal, it is contended that the trial court (1) abused its discretion in ordering change of custody; and (2) erred in failing to adjudge plaintiff in contempt and in denying defendant's motion for increased support payments.

The original judgment provided that plaintiff pay defendant $40 per month as support for the children while he attended school and thereafter $50 per month therefor. He was graduated from the University of Minnesota at Duluth in June of 1950. Since prior to the divorce, his income has ranged between $205 per month and $410 per month, which he has earned for some time past. Almost from the outset he became delinquent in making the required payments, and at the time of the hearing, he was approximately $1,800 in arrears thereon.

When the parties were married, defendant was 16 years of age. Throughout all the years since her marriage up to the present, ex-

cept for short intervals while bearing the children, she has worked principally as a waitress in St. Paul and devoted the major portion of her earnings to the boys' support. She has received no local, state, or federal aid therein. Subsequent to the divorce she was obligated to pay substantial sums for bills, including those for medical services incurred during the marriage, and at various times her wages were garnisheed to enforce collection of such items.

In St. Paul while the children were infants, it was necessary for defendant to employ others to attend them while she worked. Her payments for this ranged between $90 and $110 per month, although her earnings then averaged only about $160 per month. The children did not thrive under this arrangement, and in September of 1949, she took them to live with her mother, Mrs. Pearl Pulkrabek, then 42 years of age, in Beroun, near Hinckley. Since September of 1949 she has paid her mother $75 per month during the time the children have lived with her. She has visited the children one, two, or three days each week end since that time and has had them with her in St. Paul during Christmas and Easter vacations, as well as for substantial periods during the summer. To facilitate such visits, she purchased a small car on contract some years ago and has made payments thereon in addition to her other expenses.

Plaintiff remarried in July 1949, about seven months after the divorce. He has one daughter by this marriage now four years of age. After his graduation from the university at Duluth, he was employed between September 1950 and June 1951 as a teacher at Solon Springs, Wisconsin, at a salary of $260 per month. In June 1951 he commenced work with his present employer, American Steel & Wire Company, at $280 per month, and from time to time thereafter his wages increased until the present level of $410 per month was reached.

Defendant testified that since the divorce for the most part plaintiff's whereabouts have been unknown to her; and that in 1950 or 1951, the county attorney of Ramsey county, upon her complaint, instituted proceedings against him for nonpayment of support but was unable to locate him. His address shifted from time to time.

He resided in Duluth from the divorce until September 1950; from September 1950 until June 1951 he resided at Solon Springs, Wisconsin; from June 1951 until June 1952 he resided at 6716 West Boulevard, Duluth; from June 1952 to January 1953 he resided at Cloquet; from January 1953 until May 1954 he resided at 426 North 81st avenue west, Duluth; and from May 1954 to the present he has resided at 401 North 84th avenue west, Duluth. When asked at the hearing in June 1954 if he had kept defendant informed of his location, he replied that his name had been listed in the Duluth directory for about 1½ years, presumably since January 1953, when he returned to Duluth from Cloquet, although the record does not show publication date of the directory that year.

The records of the probation officer of St. Louis county, where plaintiff was required to make the support payment, show that defendant engaged the services of an attorney to collect arrearages during the period that plaintiff was working at Solon Springs; that the last letter from him to the probation office was delivered in March 1952; that the envelope therefor was postmarked "Superior, Wisconsin," and his return address thereon given as "Ironwood, Michigan," although he then resided at 6716 West Boulevard, Duluth; and that except for $25 paid in April 1953, the last payment received from him prior to the hearing was in December 1952. Such records further disclosed that payments totaling $275 were held in the probation office from November 6, 1952, to May 18, 1953, because a letter mailed to defendant in St. Paul had been returned, although a letter from her attorney dated May 11, 1953, advised the office that defendant had resided at the same address to which his previous letters had been mailed until May 1, 1953, when she had moved to 657 Grand avenue, St. Paul, her present address. The files also disclosed a letter to defendant dated January 4, 1954, in which the probation officer stated:

"For quite some time we had received no payment from Mr. Lammi, nor have we any word from you.

"We are writing you at this time to learn whether or not you know Mr. Lammi's current address. If you do know, kindly advise us so we may contact him.

"We will expect to hear from you on this by return mail."

Plaintiff justifies his failure to make the required payments or any payments except $25 since December of 1952 on the ground that the removal of defendant's mother, her husband, and the children from their farm home at Beroun in March 1953 to one at Brook Park some five miles away had made it impossible for him to locate them until December 1953. The record discloses that plaintiff visited the children in December of 1952 and that when he called again in March 1953 the family had moved with the children. Both Beroun and Brook Park are served by the same post office. Mr. Pulkrabek had lived in this neighborhood for over 50 years and Mrs. Pulkrabek for at least 20 years. They were well known and liked by their neighbors. Both the county attorney and sheriff of Pine county had known them for several years. After they moved, the children continued to take religious instructions from the Reverend James Dowler at Brook Park in the same church in which they had received instructions from him since the spring of 1952. There is nothing to indicate that at the time plaintiff made any extended effort to determine where they had moved, information which might readily have been obtained from either the neighbors, the postmaster, the county officials, the minister, or relatives of Mrs. Pulkrabek. He testified that at the Brook Park post office, from which Pulkrabeks continued to receive their mail, they didn't understand him because he didn't pronounce "Pulkrabek" correctly; and that he couldn't locate defendant's brother at Hinckley, because he was unable to remember the family of defendant. Not knowing plaintiff's location (he had just returned to Duluth from Cloquet), neither the Pulkrabeks nor the defendant could advise him of the change.

He testified that during 1953 he drove to St. Paul several times to locate defendant; that at Lee's Broiler, where she worked until October 1951, and at the building in which she had resided until January 1949 he made inquiries as to her address without success.

During all this period defendant continued to live at the addresses in St. Paul, which, as above indicated, were carried on the records of the St. Louis county probation office, but plaintiff made no inquiry there. He relates his ultimate discovery of the children's location in December 1953, as the result of an inquiry of defendant's brother at Hinckley who promptly directed him to the Pulkrabek Brook Park farm.

It was shortly after this that defendant became insistent upon the delinquent support payments being made. In an affidavit made after the institution of the contempt proceedings, plaintiff made the contention that the removal of the Pulkrabeks to their new farm home in March of 1953 had caused him to lose track of his children until December 1953. He stated that he had endeavored to locate them through the probation office, but there is nothing in the records of that office or in the testimony of the probation officer to substantiate this. He asserted that visitation with his children had been made difficult and sometimes impossible because on occasions he would not find them at home; or was told they were taking naps; or was given other reasons as to why he could not see them. His direct testimony was rather indefinite on this contention, and in the testimony of his relatives who at times accompanied him on his visitations, there is little to lend support to this claim.

Later in support of his motion for custody, he filed an affidavit wherein he stated that almost immediately after the judgment defendant had placed the children in the home of her mother at Hinckley and that they had since resided without interruption at Hinckley, Beroun, and Brook Park. In this affidavit he stated that he had learned from personal visitation and investigation that the home of defendant's mother had not been a healthful or Christian home for the children; that they had suffered mentally and physically by reason of lack of parental care; that defendant's mother had used intoxicants to excess; and that the children had not been given religious instructions as they should have. This affidavit was dated June 3, 1954, which was at least five years subsequent to the time he had commenced visiting the children at the home described.

At the hearing, he testified that in December 1953 in conversation with a neighbor of the Pulkrabeks the latter had by some gesture implied that something was amiss at the Pulkrabek home which made him feel that he should check further as to its suitability for his children; but that he did not call upon this neighbor to inquire further until June 22, 1954, after the contempt proceedings had been instituted, and he presented no affidavits or testimony thereon. He testified further that prior to the divorce on many occasions, with his consent, the children had been left with defendant's mother at defendant's family home near Hinckley for substantial periods while he was away and defendant working; and that after the divorce and subsequent to September 1949, he had visited the children many times at the Pulkrabek home in Beroun. During all this period he made no protest as to defendant's mother or as to conditions in her home and seemed satisfied with the arrangement, which shifted the major burden of support to defendant and her mother.

While there is evidence that Mrs. Pulkrabek used intoxicants, there is nothing to indicate that this interfered with her care of the boys or that plaintiff considered it of sufficient importance to take any action because of it during the five years the children lived in the Pulkrabek home, until after the contempt proceedings had been instituted. There is evidence from neighbors, from the local minister, and from the boys' teacher that under Mrs. Pulkrabek the boys were well cared for; that they were given three "square" meals each day; that they carried well-filled lunch boxes to school; that they had their own room at home; that they were neatly dressed and were well mannered and healthy; and that they received religious training twice each week from the Reverend Mr. Dowler. They appear to have led normal lives with adequate opportunity for recreation. On the witness stand plaintiff conceded that they looked well and healthy, were well mannered, and that he could find nothing wrong with them.

In June 1954 the boys returned to St. Paul with defendant. In August 1954 she married Mr. Don Falde, whom she had known for several years, and she, Mr. Falde, and the two boys now live in a large four-room apartment in St. Paul. Mr. Falde has steady employ-

ment, and defendant contemplates terminating her work as a waitress and devoting full time to the care of her home and the boys.

The question presented of course no longer relates to the Pulkrabek home but rather to the fitness of defendant to retain custody and the adequacy of the present home in St. Paul, with the welfare of the children paramount in determining these issues. As to defendant's fitness for continued custody, the record indicates that she has borne the complete measure of her responsibility and has devoted the full limit of her time, efforts, and income to care for the boys. A report of the Ramsey county welfare board dated July 29, 1954, and submitted in response to the trial court's request for an investigation stated:

"* * * there is no indication whatever that Mrs. Lammi is an unfit or incompetent mother.

"* * * we have never been more favorably impressed with a mother's interest and planning for her children and feel it would be a mistake to even consider their removal. The boys * * * expressed their complete happiness * * * and have no desire to live elsewhere."

The Ramsey county probation office also conducted an investigation at the trial court's request on July 26, 1954. It reported that defendant occupied a pleasant second-floor apartment in a good neighborhood with large living room and kitchen, a good-sized hall, and two bedrooms; that the furnishings were nicely arranged and "homey"; that the boys were happy, well behaved, and healthy; that there was a good relationship between them and their mother; and that they had joined a YMCA camp group and were looking forward to their summer vacation.

With respect to defendant's work, the report stated that she was working at the "Town House" cafe, a reputable cafe catering to businessmen and in no sense a night club or tavern; that she had taken courses in sewing, catering, and cake decorating and had made large cakes for weddings to augment her income; and that she hoped to do this after her coming marriage.

As to Mr. Falde, defendant's present husband, the record discloses that he is kind to the boys and has taken care of them on many occa-

sions when defendant was required to work late; that on occasions he has taken them swimming, played games with them, visited the zoo with them, and has always manifested a real interest in their welfare. To a Pine county investigator, the boys described him as a "great guy." The report of the Ramsey county probation office stated that he was of good character, a church member, employed by the Firestone company in St. Paul; that defendant had known him several years and had also known and was fond of his parents; that he hoped to build on lots which he owned next to his parents' home in St. Croix Beach; that he wanted the boys and could support them and felt that the support money required of plaintiff should be set aside for the boys' education; that the Reverend Mr. Wattman of the Bethlehem Lutheran Church at Bayport (who later witnessed the marriage of defendant and Mr. Falde and baptized the children) advised the investigator that Mr. Falde and his parents were regular parishioners of his church and very fine people; and that the senior Faldes were pleased with their son's choice in marriage and very fond of the boys.

The investigator in her conclusion stated:

"Both Mrs. Lammi and Mr. Falde impressed me as being very sincere people of unusually good character. Mrs. Lammi has struggled to give her boys the best possible care and supervision over the past eight years. She made the best and most adequate plans she could manage considering her limitation as a wage earner and the fact that it was necessary for her to work for a living. Certainly, she has managed much better than most would be able to do in the same situation, and, certainly there were no indications at all that she has not been or would not be a fit or competent mother for the two boys in the future. The two boys are in, themselves, the best advertisement that she has done a more than satisfactory job of planning and supervising for them. The boys impressed me as being well adjusted and secure despite the fact that they are the product of a broken home. Neither Frances Lammi nor her fiance appear to be the type of person interested primarily in his own pleasure or in constantly 'stepping out' or living a 'gay life.' Neither are they, in

any sense, what could be considered intellectuals although they do hope their children can have college educations. Their chief interest seems to be in working for a happy, secure home which they can enjoy with their family.

\* \* \* \* \*

"In my many years in child welfare and probation work, I have seldom encountered anyone who has impressed me as doing a more adequate job despite her youth and lack of specialized training."

Plaintiff's proposal as to the home he planned for the boys was that his wife, his daughter, and the two boys would move with him to his mother's farm near Carlton until such time as he could procure a home of sufficient size for all of them in Duluth where he is employed. No investigation of the proposed home was directed by the trial court, and no report submitted. The judgment indicates, however, that plaintiff's mother is approaching 70 years of age, and there is nothing to show that she would be willing or able to accept, even temporarily, the additional burden proposed for her.

■ We are compelled to conclude from the foregoing that there is nothing in the record which in any way reflects on the character or fitness of the defendant or which fails to justify her continued custody of the boys. We do not feel that her action in placing them with her mother during their early childhood while she was struggling to maintain them, in the belief that this course would be best for their general welfare, constitutes a sufficient basis for now taking them from her. While it may have been inconsistent with the terms of the original judgment, it should not be overlooked that plaintiff's default thereunder may have been a strong factor in compelling defendant to adopt the plan followed. Her devotion to the children, her years of work to maintain them, and her sacrifice of week ends and vacation periods to be with them establish beyond doubt her concern for them and the fulfillment of the trust imposed upon her when their custody was awarded her. Likewise, there is nothing in the record which would cast any doubt as to the adequacy of the present home provided for the boys in St. Paul. Their surroundings are pleasant and healthful, and they seem happy in their

life there. Defendant's proposal to devote her full time to the home and Mr. Falde's interest in the boys must give them an adequate feeling of security and should be of material benefit in their education and general development. To remove them now from their home permanently and to compel them to live with those who are more or less strangers to them could well result in serious maladjustments affecting their whole future. Their welfare being of paramount consideration (French v. French, 236 Minn. 439, 53 N. W. [2d] 215; Kaehler v. Kaehler, 219 Minn. 536, 18 N. W. [2d] 312), we must hold the trial court erred in depriving defendant of their continued custody and that its order of August 31, 1954, to such effect must be reversed.

■ With reference to the order denying defendant's motion that plaintiff be adjudged in contempt for failing to make support payments in accordance with the judgment, the record does not disclose that this issue was given full consideration by the trial court. The proceedings relative thereto indicate merely an admission by the plaintiff that he was in arrears in excess of $1,800 and an order by the trial court that such arrearages be made up at $25 per month. Our survey of the evidence fails to reveal any substantial factor which would justify plaintiff's failure to comply with the judgment. We refrain from disposing of this issue on the present record, however, making it clear only that neither the trial court's order of June 11, 1954, nor this opinion will foreclose its future determination, should defendant desire to proceed further therewith, in the event of plaintiff's failure to comply with the provisions herein. See, Papaik v. Papaik, 235 Minn. 393, 51 N. W. (2d) 68; Williams v. Williams, 221 Minn. 441, 22 N. W. (2d) 212.

■ As to defendant's motion for increased support payments, while changed circumstances of the parties and the lessened purchasing power of money indicate that an increase is merited, plaintiff's payment of arrearages may make it impractical to order such an increase at this time. It is felt that his compliance with the judgment by payment of $50 per month for support, plus his payment of $25 per month until the arrearages thereunder have been paid, will

be sufficient for the present. When such arrearages have been paid, further consideration may be given to the question of an increase under circumstances prevalent at that time.

■ The original judgment provided that plaintiff have the right to visit the children at reasonable times. We feel that the parties should co-operate to give effect to this provision as long as plaintiff is not in default in making the payments as above required. During vacation periods we see no reason why the children should not be permitted to visit their father's home for some reasonable period if adequate quarters therefor are provided. If some co-operation between the parties is manifested, an amicable arrangement to make this possible no doubt can be worked out without the need of a court order.

The orders appealed from are reversed with directions to enter an order in accordance herewith. Defendant is allowed the sum of $250 for her attorney's fees in this court together with her costs and disbursements.

Reversed.